IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DOUG MASSEY,<br><br>    Plaintiff,<br>v.<br><br>EBIX, INC. a Delaware corporation,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:14-cv-00897-DN<br><br>District Judge David Nuffer |

Plaintiff Doug Massey moves for summary judgment, arguing that there are no issues of fact and the law should be decided in his favor.[1] The parties' memoranda and supporting documentation have carefully been reviewed. For the reasons set forth below, Mr. Massey's Motion is DENIED. Oral argument is unnecessary.[2]

## Contents

FACTUAL BACKGROUND ........................................................................................................ 2
STANDARD FOR SUMMARY JUDGMENT ............................................................................. 3
DISCUSSION ................................................................................................................................ 3
  *MetLife TPP Sales* ........................................................................................................... 4
  *Cooperator's Insurance Sales* ......................................................................................... 6
  *Annual Performance Bonus* ............................................................................................ 7
  *Restricted Stock Options* .............................................................................................. 10
  *Mercedes Benz Bonus* .................................................................................................. 10
ORDER ........................................................................................................................................ 11

---

[1] Motion of Doug Massey for Summary Judgment; Memorandum of Points and Authorities; Statement of Elements and Undisputed Material Facts ("Motion"), docket no. 25, filed April 5, 2016.

[2] *See* DUCivR 7–1(f).

## FACTUAL BACKGROUND[3]

Mr. Massey was employed by Defendant Ebix, Inc. ("Ebix") as its Vice-President of Sales for Ebix Exchange since 2010.[4] Mr. Massey signed a Commission and Bonus Compensation Summary for the Vice-President of Exchange Sales ("VP Agreement")[5] on April 26, 2012.[6] The VP Agreement provided for a performance bonus to be paid to Mr. Massey at the end of each calendar year if the Exchange Sales team exceeded the sales quota by certain margins.[7] Aside from the VP Agreement, Mr. Massey also signed yearly commission plans. On March 2, 2012, Mr. Massy signed a Calendar Year 2012 Commission Plan ("2012 Commission Plan").[8] Similarly, on May 3, 2013, Mr. Massey signed a Calendar Year 2013 Commission Plan[9] ("2013 Commission Plan"), and the following year on May 17, 2014, Mr. Massey signed a Calendar Year 2014 Commission Plan[10] ("2014 Commission Plan").[11] The 2014 Commission Plan was much longer than the two previous plans. An amendment to the 2014 Commission Plan[12] was signed on May 22, 2014 ("2014 Amendment").[13]

---

[3] While Mr. Massey optimistically stated he was citing "agreed facts" (Motion at 1), Ebix disagreed with most of them. *See* Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Opposition") at 2–12, docket no. 26, filed May 2, 2016. Therefore there is little opportunity to find undisputed facts except for these undisputed background facts.

[4] Motion at 1.

[5] Docket no. 26-1, filed May 2, 2016.

[6] Motion at 3; Opposition at 2.

[7] Motion at 3; Opposition at 3 (Ebix disputes the suggestion that the performance bonus is guaranteed. It argued that a performance bonus is only given if the sales team exceeds the sales quota by certain margins. This fact has been edited to remove the dispute).

[8] Docket no. 25-1, filed April 5, 2016.

[9] *Id.*

[10] *Id.*

[11] Motion at 5; Opposition at 8 (undisputed).

[12] Docket no. 25-1, filed April 5, 2016.

[13] *Id.*

The Commission Plans provided, among other things, that Ebix Exchange salespeople, including Mr. Massey, were to be paid a commission based on the total amount of cash received for each new deal, payable within thirty days of receipt of the cash by Ebix.[14] On September 13, 2014, Mr. Massey sent Ebix a demand letter, arguing that Ebix had failed to fully compensate him for his services, including earned bonuses, commissions, and unrestricted stock.[15]

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16] When analyzing a motion for summary judgment, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[17] However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[18] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[19]

## DISCUSSION

Mr. Massey contends that Ebix has failed to fully compensate him for his annual performance bonus, personal sales commissions, special restricted stock options, and failed to fulfill the promise of a Mercedes Benz for meeting and exceeding certain sales goals. Ebix argues that it has paid all commissions and bonuses owed to Mr. Massey[20] and that the promise

---

[14] Motion at 6; Opposition at 8 (undisputed).

[15] *See* Demand Letter, docket no. 25-1, filed April 5, 2016.

[16] Fed. R. Civ. P. 56(a).

[17] *Mathews v. Denver Newspaper Agency LLP,* 649 F.3d 1199, 1204 (10th Cir. 2011) (citation and internal quotations omitted).

[18] *Ford v. Pryor,* 552 F.3d 1174, 1178 (10th Cir. 2008) (citations omitted).

[19] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Kerber v. Qwest Group Life Ins. Plan,* 647 F.3d 950, 959 (10th Cir. 2011).

[20] Opposition at 2.

of a car was never really made.[21] Although the parties' briefs do not model clarity, it appears the crux of the parties' dispute involves the interpretation of certain provisions in the Commission Plans and VP Agreement (collectively "Contracts"). "Whether ambiguity exists in a contract is a question of law."[22]

> Under basic rules of contract interpretation, courts first look to the writing alone to determine its meaning and the intent of the contracting parties. "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." Only where there is an ambiguity in the terms of the contract may the parties' intent be "ascertained from extrinsic evidence."[23]
>
> A court should also "consider each contract provision . . . in relation to all of the others,

with a view toward giving effect to all and ignoring none."[24]

*MetLife TPP Sales*

A central dispute in the parties' calculations for Mr. Massey's compensation is whether Mr. Massey is entitled to commission on the MetLife TPP sales. Ebix contends that several factors govern a salesperson's commission[25] Did the salesperson "(1) generate the lead; (2) participate in initial client meetings; (3) participate in the formal Request for Proposal process; (4) participate in the post-Request for Proposal due diligence; (5) execute the Statements of Work; (6) set and negotiate pricing of the product; and (7) participate in the closing of the

---

[21] *Id.* at 6.

[22] *Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah, 1991).

[23] *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 975 (Utah 2009) (quoting *Green River Ranch Canal Co. v. Thayn*, 84 P.3d 1134, 1141 (Utah 2003)). *See also Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 178 P.3d 886, 890 (Utah 2008).

[24] *Café Rio, Inc. v. Larkin–Gifford–Overton, LLC,* 2207 P.3d 1235, 1240 (Utah 2009).

[25] Opposition at 19.

sale[?]"[26] According to Ebix, Mr. Massey is not entitled to commission for the MetLife TPP sales because he "did not complete any of these tasks."[27]

Mr. Massey argues that he "completed all requirements of the . . . 2013 Commission Plan in order to qualify for payment of the commission on this sale."[28] As part of the 2013 Commission Plan requirements, Mr. Massey asserts:

> The Policy Processor was an Ebix Exchange Product. Plaintiff was an employee in good standing at the time of commission payment. Plaintiff had exceeded his quota in 2012 and his 2013 sales exceeded $300,000. This sale was a new deal. He was Ebix's sole commissioned salesperson on the project at the time that the definitive agreement was executed by the customer and the fees were committed to in writing. The deal closed (signed) during the calendar year 2013, including all cash payments received after 2013 related to the first contract year of such deal.[29]

Mr. Massey contends that Ebix should not be allowed to "redefin[e] the terms after the fact, so that no one qualifies for a commission."[30]

Although Mr. Massey contends that he has met the 2013 Commission Plan requirements, most of these alleged facts only appear in the "Argument" section of his Reply brief. They are not recited in his claimed facts and not even argued in his opening brief. The record regarding the MetLife sales is disputed and the issue of Mr. Massey's commission for the MetLife sales cannot be resolved on summary judgment. Several unanswered questions of fact that will need to be resolved at trial, including: (1) what are the MetLife TPP sales?; (2) must only the requirements of the 2013 Commission Plan be met in order to merit commissions for the MetLife sales or should the additional factors referenced by Ebix be considered?; (3) did Mr. Massey

---

[26] *Id.* (citing MetLife Case Study – Sales Cycle, Exhibit N, docket no. 26-14, filed May 2, 2016; and Key Phases of the Typical Lifecycle, Exhibit O, docket no. 26-15, filed May 2, 2016).

[27] *Id.*

[28] Plaintiff's Reply Brief in Support of Motion for Summary Judgment; Reply to Opposing Statement of Elements and Undisputed Material Facts ("Reply") at 4, docket no. 27, filed May 16, 2016.

[29] *Id.* at 4-5.

[30] *Id.* at 8.

meet all the requirements of the 2013 Commission Plan?; and (4) were the MetLife TPP sales completed before Mr. Massey became involved in MetLife? These are only a few examples of unanswered questions of fact.

*Cooperator's Insurance Sales*

Mr. Massey asserts that he is entitled to "unpaid commissions equal to 6% of . . . [his] sale of TPP hosting service and TPPSOW#3 to Cooperator's Insurance, for which defendant will receive $2,608,898."[31] Mr. Massy states that he "is or will be owed at least $85,000 for this sale, in addition to what has already be[en] paid to him by Ebix."[32] Ebix responds that the Cooperator's Insurance sale falls within the 2014 Commission Plan, which "specifically states that '[a] salesperson that voluntarily terminates their [sic] employment will be paid for commissions earned through their last day.'"[33] Ebix contends that Mr. Massey resigned on October 2, 2015, and as of that day, Cooperator's Insurance had paid Ebix, Inc. $850,651, for which Mr. Massey was paid 100% of his commission ($29,733).[34] In reply, Mr. Massey states that he was "solely and directly responsible for the Cooperator's Insurance Company Sale and had completed all aspects of the sale during his employment[,]" and therefore he is "entitled to his entire commission of $127,340 for the full amount of the sale, even though Ebix repeatedly breached his contract and demoted him in retaliation for not dismissing his complaint, forcing his resignation effective October 2, 2015."[35]

---

[31] Motion at 7.

[32] *Id.*

[33] Opposition at 10.

[34] *Id.*, n. 23.

[35] Reply at 14.

6

Ebix correctly points out that the 2014 Commission Plan states: "A salesperson that voluntarily terminates their employment will be paid for commissions earned."[36] The Commission Plan also states that "commissions earned are calculated on cash collected from new sales and upsells."[37] Mr. Massey's argument is not entirely clear, but he appears to be arguing that he did not voluntarily resign but instead was forced to resign, and therefore the provision should not apply to him. But a decision cannot be made as Mr. Massey provides no legal or factual support for his argument.

*Annual Performance Bonus*

**Commission Calculation by Cash Received.** Mr. Massey argues that the VP Agreement requires "the use of gross team sales" rather than "cash receipts" when calculating his additional performance bonuses.[38] Ebix, however, reads the Contracts to require the use of cash receipts when calculating bonuses.[39] Mr. Massey basis his argument on the Additional Performance Bonus paragraph of the VP Agreement which states:

> The VP of Sales will also earn a performance bonus paid at the end of each calendar year. The performance bonus will be calculated by multiplying total team sales times an additional percentage listed in the table below. The additional percentage is based on the percentage sales team members who achieve or exceed their goals . . . .[40]

When the above provision is read in context with all of the Contracts, it clearly and unambiguously uses "cash receipts" as a basis of measurement. All of the Contracts state that payments of commissions are based on "cash received;" are due "provided cash is received;" depend on "receipt of such cash;" are paid out of "cash collected," etc. Because commissions for

---

[36] 2014 Commission Plan at 1.

[37] *Id.*

[38] Reply at 8.

[39] Opposition at 20.

[40] VP Agreement at 2.

7

individual team members are based on the amount of cash received from their individual sales, then it is axiomatic that the total cash received by the team sales is used in calculating the VP of Sales' performance bonus.

**Trigger and Calculation of Performance Bonus.** The VP Agreement contains the following Additional Performance Bonus table, setting percentages payable

> Achieve less than 50% of cumulative sales quota – No performance bonus
> Achieves 51%-65% of cumulative sales quota – 0.5% performance bonus on all sales
> Achieves 66%-75% of cumulative sales quota – 1% performance bonus on all sales
> Achieves 76%-85% of cumulative sales quota – 1.5% performance bonus on all sales
> Achieve 86%-100% of cumulative sales quota – 1.75% performance bonus on all sales
> Exceeds cumulative sales quota by 10% - 2% performance bonus on all sales plus special restricted stock grant
> Exceeds cumulative quota by 25% - 2.25% performance bonus on all sales plus special restricted stock grant[41]

Prior to the 2014 Amendment, the cumulative sales quota was triggered and calculated based on cash collected. But the trigger for entitlement to the bonus changed in 2014. The 2014 Amendment states: "Effective with this Amendment 1, quota attainment will be calculated based on invoicing during the quota period for qualified agreements. Commissions remain earned when cash is collected for applicable deals, presuming all other eligibility criteria outlined in the Plan has been met."[42] These two sentences clarify the distinction between entitlement to a commission and calculation of a commission, which in turn affect the entitlement to and calculation of the Additional Performance Bonus. Accordingly, Mr. Massey's entitlement to a 2014 performance bonus percentage is determined by calculating *invoicing* during the quota

---

[41] VP Agreement at 2.

[42] 2014 Amendment.

8

period instead of cash collected. Once the quota level is determined, the corresponding percentage used for the performance bonus continues to be calculated on cash collected.

**"Team Sales."** Mr. Massey also takes issue with Ebix's interpretation of "team sales" in the VP Agreement. He contends that Ebix incorrectly interprets "team sales" to exclude the direct sales by him and Michael Sladek from the total sales by the team.[43] Mr. Massey argues that "[t]he override commissions and performance bonus reports submitted by plaintiff and approved by Ebix's Senior Vice-President Corporate of Global Sales Dan Delity for three years always included Mr. Massey and Mr. Sladek as members of their team, and Mr. Donahy had no authority or basis for ignoring their individual contributions to the team."[44]

Mr. Massey's signed Commission Plans for 2012 through 2014 required the Ebix Exchange salespeople, including Mr. Massey, to meet certain sales quotas—determined by the total amount of cash received—to be paid a commission.[45] Because Mr. Massey is required to meet an annual direct sale quota and is considered not only the Vice-President of Sales for Ebix Exchange but also a salesperson, he is part of the sales team, and therefore, his direct sales are included in the total team sales. However, there is insufficient information in the summary judgment record to determine whether Mr. Sladek's direct sales should also be included. The questions that will need to be answered regarding Mr. Sladek include, among other things: (1) how a sales team is determined?; (2) was Mr. Sladek part of Mr. Massey's sales team?; (3) did Mr. Sladek have an annual direct sales quota requirement?

---

[43] Reply at 11.

[44] *Id.* at 11-12.

[45] Motion at 12.

*Restricted Stock Options*

Mr. Massey contends that his sales team exceeded its cumulative sales quota by 25% in 2012 and 2013, and therefore, the VP Agreement guarantees him a special restricted stock grant, which remains owing and due for both years.[46] Ebix argues that "[t]he special restricted stock grant was not guaranteed, but was instead issued solely at the discretion of the Compensation Committee of the Ebix, Inc. Board of Directors. Further, the Exchange Sales Team did not exceed its 2012 [and 2013] team goals by more than 25%."[47]

The language at issue in the VP Agreement states:

Based on the quota reached by the sales team, the VP gets an additional annual bonus of total sales for their team multiplied by the percentage in the table below:

. . .

Exceeds cumulative sales quota by 10% - 2% performance bonus on all sales plus special restricted stock grant

Exceeds cumulative quota by 25% - 2.25% performance bonus on all sales plus special restricted stock grant.

The plain language above allows no other reasonable interpretation than that advanced by Mr. Massey—that if quotas are met, the restricted stock is guaranteed. There is no contractual language to indicate the grant is discretionary with Ebix.[48] There remains, however, the issue of whether Mr. Massey exceeded his cumulative sales quota for 2012 and 2013 which will need to be resolved at trial.

*Mercedes Benz Bonus*

Mr. Massey states that at the Key Executive Meeting held in Maui in October 2014, Robin Raina, the President of Ebix, "announced a special incentive to give a new Mercedes Benz

---

[46] Reply at 12.

[47] Opposition at 4-5.

[48] For this reason, Ebix's proffered parol evidence may not be considered.

convertible automobile to any salesperson who personally exceeded $2 million in direct sales."[49] Mr. Massey contends that he "exceeded the requirement, but Ebix never gave . . . [him] the automobile."[50] Ebix states that "Robin Raina never promised or committed to give a Mercedes Benz vehicle to any salesperson . . . . Instead, during the executive meeting, Mr. Raina led a discussion of possible ideas that Ebix could implement to incentivize its salespersons, including possibly giving them a car if they met certain sales thresholds."[51] The parties' factual positions on this issue are supported by conflicting deposition testimony, and thus the facts on this issue are in genuine dispute.

## ORDER

For the reasons discussed above, it is HEREBY ORDERED that Mr. Massey's Motion[52] for Summary Judgment is DENIED. However, the contractual interpretations in this order stand and will govern further proceedings.

Dated July 5, 2016.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[49] Motion at 5.

[50] *Id.*

[51] Opposition at 6.

[52] Docket no. 25.